IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 5, 2011 Session

## STATE OF TENNESSEE v. TEDDY RAY MITCHELL

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Hamblen County**
**No. 06CR464      John F. Dugger, Jr., Judge**

---

**No. E2008-02672-SC-R11-CD - Filed March 31, 2011**

---

The defendant was convicted of disorderly conduct and sentenced to thirty days in jail, to be served on probation. On direct appeal, the Court of Criminal Appeals reversed, holding that the evidence was insufficient. This Court granted the State permission to appeal in order to consider the admissibility of a racially derogatory term, to review the sufficiency of the evidence, and to determine whether the conviction violated the constitutional right to free speech. Because the disputed testimony was properly admitted, the evidence was sufficient to support a conviction for disorderly conduct, and there was no violation of the right to free speech, the Court of Criminal Appeals is reversed. The judgment of conviction and sentence is reinstated.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, and WILLIAM C. KOCH, JR., JJ., joined. SHARON G. LEE, J., filed a separate opinion concurring in part and dissenting in part.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Asst. Attorney General; C. Berkeley Bell, District Attorney General; Victor Vaughn, Asst. District Attorney General, for the appellant, State of Tennessee.

Darren V. Berg, James Charles Wright, and Robert Deno Cole, Knoxville, Tennessee, for the appellee, Teddy Ray Mitchell.

### OPINION
### Background

A rally was scheduled at 2:00 p.m. on June 24, 2006, at the Hamblen County Courthouse grounds in Morristown by a group attempting to raise public awareness of the

effects of illegal immigration. Organizers promoted the event with a pamphlet that extended a general invitation to attend the rally, "[b]ring your family, wave the American flag proudly, and display signage that educates."

Lieutenant Chris Weisgarber, a training officer with the Morristown Police Department, was placed in charge of the planning and coordination of security for the rally. Because he had received information that between three and five hundred members of an Hispanic organization, having views on the immigration issue that were in conflict with the organizers of the event, also planned to attend, Officer Weisgarber, with the assistance of the Hamblen County Sheriff's Department and the Tennessee Highway Patrol, arranged a security force of between seventy-five and ninety law enforcement officers in an effort to avoid possible confrontations between the two groups. Some officers were stationed on the roofs of buildings, a number of squad cars were present, designated parking areas were established, and the perimeter of the rally area was marked with temporary orange fencing. At a checkpoint established by the police, attendants were screened and searched in order to assure that no weapons were present. The security plan permitted the American flag, but did not permit flagpoles of any size to be carried into the demonstration area for fear that they might either contain a hidden weapon or be used as a weapon. A single flagpole displaying the American flag was placed near the speaker stand, which was separated from those in attendance by a fence and several officers.

The course of the events that led to the arrest of Teddy Ray Mitchell (the "Defendant") for disorderly conduct was reflected not only by testimony at the Defendant's November 3, 2007 trial, but also by two digital video recordings made exhibits at the trial, one taken with a camera placed by the Tennessee Highway Patrol ("THP video") on an upper floor of the courthouse (lasting one minute, forty-four seconds) and another taken from a different angle by a spectator (lasting one minute, thirty-eight seconds). Both video recordings were submitted as exhibits and were used in cross-examination of officers.

The THP video depicts only a portion of the event, beginning with the Defendant walking toward the rally after parking his vehicle, and the filming is partially obscured by a hedge and orange plastic fencing. Although the Defendant can be heard speaking or shouting, little is intelligible. The officers cannot be heard. The Defendant is arrested shortly after his arrival. The second video recording, which was not in a fixed position, begins shortly after the Defendant's arrival at the checkpoint. The audio portion is marginally better than the THP recording. Neither video recording used time-stamping to reference specific portions of the video.

At trial, Andre Kyle, a patrol officer with the Morristown Police Department, testified that he had received instructions in advance of the rally to prohibit parking along the

sidewalk near the front of the courthouse. When the Defendant attempted to park his vehicle in that area, Officer Kyle, an African-American, informed him that he would need to park in another location. In response, the Defendant said, "There's no nigger going to tell me where I can and can't park." Officer Kyle then sought assistance from Matt Stuart, also of the Morristown Police Department. After Officer Stuart also instructed the Defendant that he could not park his vehicle in that location, the Defendant reacted angrily and "sped off." According to Officer Kyle, the Defendant parked his vehicle nearby in another prohibited area, but at that point no officer was there to direct him to move; the Defendant then "made a b[ee]-line toward the [entrance] gate." As he did so, Officers Kyle and Stuart warned officers at the entrance that the Defendant was "mad." When the Defendant arrived at the entrance, Officer Kyle overheard another officer inform him that he could take his flag into the rally area but not the flagpole, which had a pointed metal eagle at the top. He recalled that the Defendant responded by loudly yelling, among other things, "I'm an American. You can't – you mean to tell me I can't bring a flag . . . ." At this point, Officer Kyle heard Officer Stuart, who had received a radio communication from another officer, inform the Defendant that he was under arrest. According to Officer Kyle, the Defendant "resisted and started fighting, pok[ing] another officer," Troy Wallen, with the flagpole as he did so. Officer Kyle stated that the Defendant shook the flagpole up and down as he struggled with the officers before "they fell into the bushes." Eventually, Officer Kyle was able to handcuff the Defendant. Officer Kyle was cross-examined with one of the videotapes of the confrontation. During the cross-examination, excerpts of the videotape were shown to Officer Kyle. The videotape was started and stopped, and the record reflects neither which videotape was used nor which portions of the videotape were used in cross-examination. Officer Kyle acknowledged that in addition to the flagpole and flag, the Defendant carried a soft drink, a poster, and a lawn chair to the entrance.

Officer Stuart, a fifteen-year veteran with the Department, testified that he was first alerted to the Defendant who, while still inside his car and some distance away, began to "scream" and "holler." In an effort to assist Officer Kyle, Officer Stuart explained to the Defendant that the area was restricted and that the Chief of Police had established the parking rules for the event. The officer recalled that the Defendant, in response, made derogatory remarks about the Chief, but moved his vehicle. He described the Defendant as cursing, "real belligerent," and "irate." After seeing the Defendant park in another "no parking" area, Officer Stuart notified Detective Chris Blair, who was at the front entrance, of the Defendant's objectionable demeanor and the possibility of "problems." According to Officer Stuart, the Defendant continued at "a fast pace" toward the entrance and was visibly upset. At the checkpoint, he informed the Defendant that the rules established to ensure safety at the event precluded the use of flagpoles in the rally area. The Defendant objected, stating he would not comply with the rule. Acting in response to the radio communication, Officer Stuart informed the Defendant that he was under arrest and initiated the process of taking the

Defendant into custody.

On cross-examination, Officer Stuart acknowledged that Tom Lowe, a Hamblen County Commissioner who had been invited to speak at the event, had been allowed to place a flagpole displaying the American flag near the speaker's stand. Officer Stuart was cross-examined with excerpts of both videotapes, but the record does not indicate whether portions or all of the videotapes were used in the cross-examination. Officer Stuart explained that the Defendant's words, in contrast to the others present, could be heard on the tape because he was "talking loud." The officer described his own speaking tone as "normal" when he informed the Defendant that he was under arrest. Officer Stuart admitted that he could not make out the Defendant cursing on the videotape.

Officer David Hancock, who had been assigned to the checkpoint at the front entrance of the courthouse but was not involved in the arrest, first noticed the Defendant when he walked briskly past an officer who had tried to stop him. Officer Hancock testified that the Defendant, despite the presence of the officers at the entrance, "wasn't paying attention to anything except what was head on . . . [and] was not paying any attention to us." Although Officer Hancock heard the Defendant shouting, he neither heard the Defendant curse nor saw him fight with the arresting officers.

Detective Blair was stationed at the main gate at the front of the courthouse. He used a metal detection wand to assure that no weapons came into the event site. As Detective Blair was informing a man and woman that they could not take a pocket knife into the courtyard, his attention was drawn to the Defendant, who was speaking in a loud voice. He recalled that even though he tapped the Defendant on the shoulder and informed him that the flagpole was not permitted, the Defendant ignored his presence. Before the Defendant was placed under arrest, however, Detective Blair had turned his attention back to the couple with the pocket knife. He did not hear any cursing by the Defendant. Detective Blair was shown portions of both videotapes on cross-examination. The portions of the videotape used in his cross-examination are not referenced in the record. Detective Blair, however, could not identify any portion of the videotape in which the Defendant used the flagpole to either fight or threaten the officers present at any time before the arrest was initiated.

Officer Tony Wallen, who had searched the grounds for explosives prior to the event, also had a metal detection wand at the front entrance in order to check for weapons. He confirmed that the officers had been specifically directed to prohibit flagpoles, sign sticks, and blunt or sharp objects. When the Defendant, who, the officer said, also had a sign in his possession supported by a stick, began to angrily "rant and rave" "about not being able to bring his flag" into the rally area, Officer Wallen recalled that he explained to the Defendant "more than once" that only the pole was prohibited, not the flag. According to Officer

Wallen, as the Defendant continued to object vociferously, he shook the pole up and down, making contact with Officer Wallen "two or three times." The officer stated that he grabbed the end of the pole to prevent it from striking anybody and to keep it from falling to the ground. He testified that the Defendant cursed and loudly demanded to know whether Mexican flags were permitted. Officer Wallen, who had previously seen the videos, was also cross-examined by the use of portions of the THP videotape that were not identified in the record. He could not identify on the tape specifically when the Defendant cursed and acknowledged that he had control of the flag and had not yet been "poked" when the Defendant was placed under arrest by Officer Stuart.

Officer Frank Lane, a detective with the Hamblen County Sheriff's Department, worked part-time as a patrolman with the Morristown Police Department at the time of this incident. While standing near the entrance of the rally area, his attention was drawn to the Defendant because he had become "loud and irate." Officer Lane recalled that when he saw the Defendant offer resistance to the arrest, he attempted to apply a taser, explaining that his "drive stun" imposed pain but did not incapacitate. He did not know whether he had been successful in making contact with the Defendant. Officer Lane was also cross-examined by the use of portions of a videotape. The record does not indicate which videotape was used or what portions were displayed during the cross-examination. Officer Lane was unable to identify the portion of the videotape in which he attempted to use his taser on the Defendant.

Lieutenant Weisgarber, who also served as a SWAT team commander and a general departmental instructor, testified that he had planned security for the rally and coordinated the officers participating in the event. He instructed the officers not to allow metal objects, lawn chairs, flagpoles, or anything that could be used as a weapon inside the fenced area. He was standing near the courthouse, some distance away from the Defendant, when his attention was drawn to loud screaming and yelling near the front entrance – "loud over everything else that was going on." Almost immediately, he sent a radio message "to get [the] person out of there" who was creating the scene. When Weisgarber arrived at the checkpoint, the Defendant was being handcuffed by the other officers. On cross-examination, he stated that the reason he told the officers to "get him out of there" was that there were many people present and it was "alarming other individuals."

Patricia Stephens, an organizer of the rally, testified for the defense. She stated that the purpose of the rally was to educate people about the cost of illegal immigration. Flyers had been distributed in order to promote attendance. She stated that when she arrived at the courthouse, she found "unbelievable" the number of law enforcement personnel present. She recalled that the Defendant approached the front entrance of the rally area carrying a sign, a lawn chair, and a flag attached to a flagpole. She explained that when she entered the marked area, officers required her to remove the sticks from the several small flags in her

possession and put them in her car; she was upset that no one could enter with a flag on a pole or even on "a little tiny stick." While acknowledging that the Defendant appeared angry and raised his voice at the officers, she did not hear any cursing and did not see the Defendant either push an officer or shake his flag at an officer. Ms. Stephens, who wore a larger flag to the event that was draped around her shoulders, never heard any of the officers inform the Defendant that he was under arrest. In her opinion, the Defendant did not resist the arrest.

Commissioner Lowe, a pharmacist by profession, testified that he had planned to talk at the rally about health issues related to immigration. He assisted the organizers by contacting the county mayor for permission to use the courthouse lawn as the site of the demonstration. Commissioner Lowe described the courthouse lawn as "completely cordoned off," without any access to parking. He stated that numerous law enforcement vehicles were present and that in addition to the police, the sheriff's department, the highway patrol, and a SWAT team in full body armor attended the rally. Commissioner Lowe testified that a "half-track," looking much like a tank, was also parked near the site, and that there were three "snipers" on the rooftops.

Commissioner Lowe's wife, Audrey Lowe, also helped organize the rally. She testified that she was positioned near the front entrance and had a good view of the confrontation between the Defendant and the officers. She stated that the Defendant neither used obscene language nor fought the officers with his flagpole. She did not see any officer get struck by the pole. She claimed that she overheard the Defendant tell officers, "Don't let my flag touch the ground."

On rebuttal by the State, Lieutenant Weisgarber acknowledged that a large number of officers were present at the rally. He explained that he expected "both sides" of the immigration issue to be in attendance and also pointed out that it was routine for the highway patrol to be involved in demonstrations of this nature.

### Verdict and Appeal

The Defendant was tried on charges of disorderly conduct and resisting arrest. At the conclusion of its deliberations, the jury found the Defendant guilty of disorderly conduct and imposed a fine of twenty-five dollars. The Defendant was acquitted of resisting arrest. At the sentencing hearing, the Defendant requested and was granted judicial diversion. Afterward, he appealed, alleging error by the admission of his statement to Officer Kyle, challenging the sufficiency of the evidence, and arguing that his conviction violated constitutional protections of free speech. The Court of Criminal Appeals dismissed the appeal, pointing out that an appeal of right exists only when there is a final judgment of conviction, Tennessee Rule of Appellate Procedure 3(b), and that the grant of judicial

diversion did not involve a conviction. State v. Mitchell, No. E2007-02807-CCA-R3-CD, 2008 WL 3539724, at *2 (Tenn. Crim. App. Aug. 14, 2008); accord State v. Norris, 47 S.W.3d 457, 463 (Tenn. Crim. App. 2000) (holding that under Tennessee Code Annotated section 40-35-313(a)(1)(A) (1997), a trial court may not impose judicial diversion except with the consent of the defendant); see also Tenn. Code Ann. § 40-35-313(a)(1)(A) (2010).

After the dismissal of the appeal, the Defendant filed a motion in the trial court to withdraw his application for judicial diversion. The trial court granted the motion and entered a judgment of conviction, sentencing the Defendant to thirty days of jail confinement. In the second appeal, the Court of Criminal Appeals set aside the conviction for disorderly conduct, holding that the video recordings of the incident conflicted with much of the officer's testimony in significant ways. State v. Mitchell, No. E2008-02672-CCA-R3-CD, 2010 WL 1241577, at *5 (Tenn. Crim. App. Mar. 31, 2010). While acknowledging that the video recordings established that the Defendant was belligerent and speaking with a raised voice in his interactions with the officers, the Court of Criminal Appeals concluded that there were no verbal threats made by the Defendant to the officers and that there was no indication in the video that Officer Wallen had been struck in the chest by the flagpole. Id. Judge Norma McGee Ogle dissented, observing that the video recordings of the incident were not inconsistent with the officer's testimony that the end of the flagpole had come into contact with Officer Wallen, "albeit briefly," during the confrontation. Id. at *6 (Ogle, J., dissenting).

This Court granted the application by the State for permission to appeal to consider (1) whether the trial court erred by the admission of potentially prejudicial evidence; (2) the sufficiency of the evidence in the context of the physical facts rule; and (3) whether the words expressed by the Defendant were protected by the right to free speech.

**Analysis**
**I.**

The Defendant first argues that the trial court erred by allowing into evidence the statement he made to Officer Kyle while he was attempting to park his vehicle. The Defendant submits that the evidence was not relevant to the charged offenses and should have been excluded because of the danger of unfair prejudice.

As noted, the Defendant was charged with both disorderly conduct and resisting arrest. The disorderly conduct statute states that "[a] person commits [the] offense [of disorderly conduct] who, in a public place and with intent to cause public annoyance or alarm . . . [e]ngages in fighting or in violent or threatening behavior[.]" Tenn. Code Ann. 39-17-305(a)(1) (2003); see also T.P.I. – Crim. 30.13 (6th ed. 2006). The law prohibiting resisting arrest provides that "[i]t is an offense for a person to intentionally prevent or obstruct anyone

-7-

known to the person to be a law enforcement officer . . . from effecting a[n] . . . arrest . . . of any person, including the defendant, by using force against the law enforcement officer or another." Tenn. Code Ann. § 39-16-602(a) (2003); see also T.P.I. – Crim. 27.04 (6th ed. 2006).

"[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" qualifies as relevant. Tenn. R. Evid. 401. While irrelevant evidence should be excluded, relevant evidence is generally admissible unless prohibited by the state and federal constitutions, other rules of evidence, or "other rules or laws of general application in the courts of Tennessee." Tenn. R. Evid. 402. Tennessee Rule of Evidence 403, however, provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of the unfair prejudice." In State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978), this Court quoted with approval a definition of unfair prejudice: "An undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (internal quotations omitted). While the word "substantially" is not defined by either our rule or the corresponding federal rule, this terminology has been construed to place a "heavy burden on the party seeking to exclude the evidence." State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). The exclusion of relevant evidence under our rule has been described as "an extraordinary remedy that should be used sparingly." White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999). When addressing this issue, trial courts must be respectful of the function of the jury. See 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5220 (1978). Rule 403 decisions fall within the discretionary authority of the trial court and will not be overturned absent an abuse of discretion. Cf. Banks, 564 S.W.2d at 952.

In this instance, the Defendant filed a motion in limine to exclude his comments to Officer Kyle, who had not included the word "nigger" in his original police report and who explained that he had chosen to substitute the term "black boy" in the report rather than the more derogatory word the Defendant had actually used. The trial court overruled the motion, holding that the evidence was reflective of the Defendant's state of mind.

In our view, the trial court acted within the bounds of its discretionary authority. The term "nigger" is offensive and thus prejudicial. Nevertheless, the use of that word is also probative as to the charge of disorderly conduct. The Defendant reacted angrily after being told not to park in a prohibited area, directly challenging the authority of the African-American officer. A white officer was called upon to intervene and to confirm the no-parking restriction before the Defendant agreed to leave. The Defendant "sped off" to park in another prohibited, but unsupervised, area before exiting his vehicle and, apparently still angry, making a "bee-line" to the checkpoint at the front entrance, where the confrontation

took place. From the proof, the jury could have easily inferred that Officers Kyle and Stuart had continual eye contact with the Defendant during the entire course of events, which, by all appearances, transpired within a matter of minutes.

Disorderly conduct is not necessarily a single act or deed. There is a nexus between the Defendant's initial conduct toward Officer Kyle and his confrontation with the police stationed at the checkpoint. The use of the offensive term is particularly probative of whether the Defendant "[e]ngage[d] in fighting or in violent or threatening behavior" "with intent to cause public annoyance or alarm" during the short interval leading to his arrest. The trial court did not, therefore, abuse its discretionary authority by admitting the evidence. See Neil P. Cohen et al., Tennessee Law of Evidence § 4.03(8) at 4-67 (5th ed. 2005).

## II.

After considering the trial testimony, seeing the video tapes, and receiving the trial court's instructions,[1] the jury concluded that the Defendant had, "in a public place and with intent to cause public annoyance or alarm . . . [e]ngage[d] in fighting or in violent or threatening behavior[.]" Tenn. Code Ann. § 39-17-305(a)(1). The Court of Criminal Appeals, however, concluded that the video recordings "belie[d] the officers' testimony in very significant ways" and were "void of any actions . . . that could be deemed physically threatening." Mitchell, 2010 WL 1241577, at *5.[2]

Initially, when the sufficiency of the evidence is at issue, well-established principles apply. On appeal, "the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on

---

[1] Because the instructions the trial court made to the jury were not made a part of the record, this Court must presume that they were proper. See Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978).

[2] After so holding, the majority on the panel, of course, found it unnecessary to address either the constitutionality of the statute's application to the Defendant's conduct or the admissibility of the Defendant's comment to the African-American police officer.

appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958). Ultimately, however, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and[, moreover,] the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). On appeal, the court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). The standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence,'" or a combination of both. Hanson, 279 S.W.3d at 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999); see also State v. Dorantes, __ S.W.3d __, 2011 WL 208306, at *7 (Tenn. 2011).

The Court of Criminal Appeals found that the events captured by the video cameras so conflicted with portions of the officers' testimony that a conviction for disorderly conduct was not warranted. For example, the court pointed out that the video recordings did "not show the Defendant shaking the flag[pole] up and down and striking Officer Wallen in the chest . . . two or three times, or at all" as indicated by Officer Kyle, and that the videos are "void of any actions . . . that could be deemed physically threatening." Mitchell, 2010 WL 1241577, at *5. Further, the majority opinion observed that there was "no testimony that the officers felt threatened by the Defendant." Id. In her dissent, Judge Ogle, in reference to the video recordings, pointed out that the Defendant, having already demonstrated his anger after being directed away from a prohibited parking area by officers Kyle and Stuart, "proceeded at a 'fast pace,' visibly upset, toward the entry gate where the officers were gathered." Id. at *6 (Ogle, J., dissenting). She observed that when directed to remove the flag from its pole, the Defendant "ranted" and "raved," "loudly taunting the officers to get the attention of other rally attendees, getting into [their] faces." Id.

From its extensive discussion of the videotape and conclusion that the videotape "belies the testimony in very significant ways," id. at *5 (majority opinion), the Court of Criminal Appeals appears to have reweighed the evidence and concluded that the videotape was necessarily more reliable than the testimony of the witnesses testifying on behalf of the State. It is of course, the role of the jury to determine the credibility of the witnesses and to resolve the conflicts in the evidence. Here, the jury, properly instructed on the statutory elements of the crime, saw the witnesses, heard their testimony firsthand, and also saw the

videotapes. The evidence is sufficient when, even if by a small margin, a rational jury could unanimously conclude from all of the evidence, direct and circumstantial, that the Defendant, "in a public place with the intent to cause public annoyance or alarm . . . [e]ngage[d] in . . . threatening behavior." Tenn. Code Ann. § 39-17-305(a)(1).

It is undisputed that the rally was held in a public place. Considering the issue in the light most favorable to the State, as we are required to do, the rally attracted individuals supporting each side of the issue of illegal immigration. The jury heard testimony that the Defendant, over a short interval of time, disregarded the parking restrictions for the rally and rudely challenged the authority of Officer Kyle, an African-American. The Defendant used an inflammatory term in reference to Officer Kyle. A white officer had to intervene. The Defendant reacted angrily and made intemperate, disparaging remarks not only to Officer Kyle, but others as well. After parking in an unguarded no-parking area, the Defendant rushed toward the security checkpoint. All of this took place before the Defendant appeared on either video. The Defendant was not amenable to stopping at the checkpoint. When one officer blocked his path, the Defendant stepped toward Officer Stuart and loudly questioned the propriety of the precautions established for the event. The Defendant's behavior attracted the attention of several spectators on hand, at least one of whom turned his camera to record a video of the Defendant's behavior at the checkpoint. Lieutenant Weisgarber, who was in charge of planning and coordinating security at the rally was so concerned about the behavior of the Defendant that he directed the officers at the checkpoint "to get him out of there."

As stated, the jury was entitled to resolve any differences in the testimony, assess the credibility of the witnesses, and draw inferences from all of the evidence as to the behavior of the Defendant. State v. Campbell, 245 S.W.3d at 335. Considering the evidence in the light most favorable to the State, the jury could have determined that the Defendant, while in a public place, intended to cause public annoyance or alarm by engaging in violent or threatening behavior. The evidence, therefore, is sufficient to support the conviction of the Defendant.

## III.

The Defendant also asserts that his conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because First Amendment protections entitled the Defendant to vociferously challenge police authority[3] so long as he

---

[3] The First Amendment to the United States Constitution prohibits any law "abridging the freedom of speech," U.S. Const. amend. I, while the Tennessee Constitution acknowledges that "[t]he free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Tenn. Const. art. I,
(continued...)

refrained from the use of "fighting" words, as defined in the landmark case of <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568 (1942).[4] The State, relying on its brief filed with the Court of Criminal Appeals, submits that the language of the disorderly conduct statute applies only when interpreted to proscribe words or conduct not protected by the federal or state constitutions and that the Defendant's behavior was unprotected.

While acknowledging there is no constitutional abridgement so long as a statute does no more than prohibit face to face words "'likely to provoke the average person to retaliation, and thereby cause a breach of the peace,'" <u>Texas v. Johnson</u>, 491 U.S. 397, 409 (1989) (quoting <u>Chaplinsky</u>, 315 U.S. at 574), the Defendant maintains that his words to the police officers fell below that threshold. <u>Cf.</u> <u>Virginia v. Black</u>, 538 U.S. 343, 359-60 (2003) (observing that a state's prohibition of "true threats" serves as a protection against the "fear of violence" and the "disruption that fear endangers"). Further, he argues that this court

---

[3](...continued)

§ 19. The Tennessee provision has been "construed to have a scope at least as broad as that afforded" the freedoms of speech and of the press by the First Amendment. <u>Leech v. Am. Booksellers Assoc.</u>, 582 S.W.2d 738, 745 (Tenn. 1979). Further, because the Due Process Clause of the Fourteenth Amendment of the United States Constitution extends the protections of the First Amendment to state and local government, any infringement by a state or local government violates the First Amendment rather than the Fourteenth. U.S. Const. amend XIV; <u>see also</u> <u>44 Liquormart, Inc. v. Rhode Island</u>, 517 U.S. 484, 489 n.1 (1996) (citing cases). First Amendment protections are expansive. <u>Sandul v. Larion</u>, 119 F.3d 1250, 1255 (6th Cir. 1997). In order to be permissible, any regulation of free speech "must serve an important and substantial public interest, wholly divorced from the suppression of free speech," and the restrictions "must be no greater than is essential to the furtherance of that interest." <u>H & L Messengers, Inc. v. City of Brentwood</u>, 577 S.W.2d 444, 452 (Tenn. 1979) (citing <u>United States v. O'Brien</u>, 391 U.S. 367 (1968)).

[4] In <u>Chaplinsky</u>, a defendant who had cursed a municipal officer, calling him a "[g–]damned racketeer" and "damned fascist" in a public place, was convicted of violating a state statute. <u>Id.</u> at 574. While upholding the validity of the statute, on its face and as applied, the Supreme Court made the following observation:

> Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words – <u>those which by their very utterance inflict injury or tend to incite an immediate breach of the peace</u>. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

<u>Id.</u> at 571-72 (emphasis added) (footnotes omitted).

-12-

should subscribe to a concurring opinion authored by Justice Powell in <u>Lewis v. City of New Orleans</u>, 408 U.S. 913 (1972) (Powell, J., concurring), who wrote that police officers should be more tolerant of "fighting" words than the average citizen and held to "a higher degree of restraint."[5]  Finally, the Defendant relies in great measure on the per curiam opinion by the United States Supreme Court in <u>Norwell v. City of Cincinnati</u>, 414 U.S. 14 (1973), as support for his argument that his conviction should be reversed on First Amendment grounds. In <u>Norwell</u>, a sixty-nine year old defendant was walking from his place of employment at a liquor store to his residence, when an officer, who had been notified of a suspicious person in the neighborhood, asked whether he lived in the area.  <u>Id.</u> at 15.  The defendant turned to walk away without answering, and the officer persisted.  When the defendant eventually said, "I don't tell you people anything," he was then arrested and later convicted under an ordinance prohibiting "noisy, boisterous, rude, insulting, or disorderly" conduct "with the intent to . . . annoy."  <u>Id.</u> at 14.  The Court reversed, holding that "[r]egardless of what the motivation may have been behind the expression in this case, it is clear that there was no abusive language or fighting words."  <u>Id.</u> at 16.

First and foremost, "[i]n evaluating the constitutionality of a statute, we begin with

---

[5] <u>See</u> <u>State v. Creasy</u>, 885 S.W.2d 829, 831-32 (Tenn. Crim. App. 1994) (holding that the defendant's curses of an officer, although "profane and insulting," were not adjudged "fighting" words because the officer was held to a higher standard, but affirming a conviction for disorderly conduct because the defendant had also displayed offensive body language – "physically position[ing] himself between the officer and the car that he was ticketing" – and the officer "had called for back-up"); <u>see also</u> <u>State v. Scott</u>, C.C.A. No. 17, 1989 WL 22736, at *1-2 (Tenn. Crim. App. Mar. 16, 1989) (reversing disorderly conduct conviction where the defendant, after being urged by a sheriff to "calm down," called the sheriff "a fat son of a bitch," because the conduct consisted entirely of verbal abuse and there was no threat of physical assault or any indication that members of the crowd were incited by the conduct); <u>Garvey v. State</u>, 537 S.W.2d 709, 711 (Tenn. Crim. App. 1975) (reversing a disorderly conduct conviction for shouting "sooey" to an officer walking toward City Hall by the application of the "average person" test established in <u>Chaplinsky</u>).

In <u>State v. Read</u>, 680 A.2d 944 (Vt. 1996), the Vermont Supreme Court observed that

[t]he fact that police officers . . . are trained to deal calmly and authoritatively with disorderly persons does not guarantee that police officers are immune from reacting instinctively in the face of an abusive tirade. . . . While police officers are experienced at handling unruly persons, the corollary is that police officers are obligated to confront such persons frequently.  We may rightly expect that a police officer will act in accordance with his or her training or disciplinary rules.  <u>But to fashion from this expectation a judicial rule that relieves a person from the reach of a criminal statute solely because the victim is a police officer is to invite the use of abusive language toward police officers.</u>  We do not believe that such a rule is sound in practice or in principle.

<u>Id.</u> at 950 (emphasis added).

the presumption that the act . . . is constitutional." State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007). "Our charge is to uphold the constitutionality whenever possible." Waters v. Farr, 291 S.W.3d 873, 882 (Tenn. 2009). Further, this Court has the constitutional authority to construe our disorderly conduct statute so that there is no prohibition of speech except for those expressions not subject to protection. Posadas de P.R. Assoc. v. Tourism Co. of P.R., 478 U.S. 328, 339 (1986); New York v. Ferber, 458 U.S. 747, 769 n.24 (1982) ("When a federal court is dealing with a federal statute . . . , it should . . . construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction. . . . A state court is also free to deal with a state statute in the same way. If the invalid reach of the law is cured, there is no longer reason for proscribing the statute's application to unprotected conduct . . . . [A] state-court decision that has construed the statute . . . is binding . . . ."). Speech integral to criminal conduct is not protected. See United States v. Stevens, ___ U.S. ___, 130 S. Ct. 1577 (2010); see also Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 498 (1949).

As indicated, the jury, instructed as to the applicable law, found that the Defendant's aggressive conduct and his loud and rude behavior violated the terms of the statute. There is proof, direct and circumstantial, of each and every element of the crime of disorderly conduct. Further, while words and also conduct expressive of an idea may qualify as protected "speech," the threatening behavior demonstrated by the Defendant does not, in our view, fall within either category.[6] Under these circumstances, the First Amendment and

---

[6] "Although the [United States Supreme] Court has long accepted the premise that certain 'expressive' acts are entitled to First Amendment protection, . . . not all activity with an expressive component will be afforded First Amendment protection." 5 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 20.49(a), at 540-41 (4th ed. 2008). We disagree with the dissent's assertion that the words and conduct for which the Defendant was arrested constituted a matter of public concern. "Deciding whether speech is of public or private concern requires us to examine the 'content, form, and context' of that speech, 'as revealed by the whole record.'" Snyder v. Phelps, ___ S. Ct. ___, 2011 WL 709517, at *6 (2011) (quoting Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761 (1985) (opinion of Powell, J.)). Although the activities taking place inside the anti-immigration rally, including "display[ing] signage that educates," may very well have risen to the level of speech addressing an issue of public concern, the propriety of those activities is not before this Court. None of the Defendant's belligerent and threatening statements and actions made towards the police when seeking to enter the rally involved an issue of public concern. They are not, therefore, entitled to the type of "special protection" discussed by the United States Supreme Court in Snyder. See 2011 WL 709517, at *5.

Moreover, even assuming that the Defendant's words and actions were protected, his choice of where and when to express himself is "not beyond the Government's regulatory reach – it is 'subject to reasonable time, place, or manner restrictions' that are consistent with the standards announced in this Court's precedents." Snyder, 2011 WL 709517, at *8 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)). In United States v. O'Brien, the Court, observing that the governmental interest sufficiently

(continued...)

article I, section 9 protections under our federal and state constitutions are not implicated.

## Conclusion

The Defendant's reference to an African-American officer as "nigger" was properly admitted into evidence. The Defendant's use of that term, his refusal to obey the officer's directive to remove his vehicle from a no-parking area until a white officer intervened, his angry response, and his loud and belligerent confrontation of the officers at the rally area checkpoint qualified as threatening behavior designed to annoy or alarm in a public place. Moreover, the Defendant's conduct is not entitled to the protections of free speech. For these reasons, the judgment of the Court of Criminal Appeals is reversed and the conviction and sentence is reinstated. Costs are adjudged against the Defendant, Teddy Ray Mitchell, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

---

[6](...continued)
justified the regulations of expressed conduct, upheld a statute prohibiting the burning of a draft card, applying a four-part test:

> A government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. 367, 377 (1968). The limitations placed on the rally participants in general, and the Defendant specifically, including prohibiting him from parkng in a restricted area and bringing a flagpole into the rally, were reasonable restrictions on protected speech, particularly considering the government's belief that a large group of citizens with views in opposition to the rally participants also planned to attend.