IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. MEINTS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
DANIEL A. MEINTS, APPELLANT.

Filed February 25, 2014.    No. A-13-509.

Appeal from the District Court for Saline County, VICKY L. JOHNSON, Judge, on appeal thereto from the County Court for Saline County, J. PATRICK MCARDLE, Judge. Judgment of District Court affirmed.

Terry K. Barber, of Barber & Barber, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

IRWIN, MOORE, and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Daniel A. Meints appeals his conviction on a charge of disturbing the peace. His claim on appeal is that the conviction should have been barred on the basis of First Amendment protections. Meints was not convicted on the basis of protected speech, and we find no merit to his appeal. We affirm.

## II. BACKGROUND

The events giving rise to this action occurred in March 2012. A consignment auction was held at the Saline Center, in Saline County, Nebraska. One of the items placed for sale at the auction was a .22-caliber rifle. The record reflects that guns sold at the auction were available for inspection prior to the auction and that trigger locks were placed on them prior to the auction "so they [could not] be utilized or used in any way" prior to being purchased.

Meints purchased the rifle during the auction, paying "around $80" for it. After Meints paid for the rifle and took possession of it, he approached Jeffrey Kotas, an employee at the auction who handled the gun transactions. Meints "shoved [the rifle] towards [Kotas] sideways, the barrel was not pointed towards [Kotas]" and said, "Where the hell's that elevator at?" Apparently an "elevation piece" that allows the user to change the elevation of the rear sight on the rifle was missing.

Meints asked Kotas, "What are you guys going to do about this?" According to Kotas, he and his younger brother looked around the facility in an attempt to locate the piece, but were unable to find it. As a result, Kotas sent for Don Homolka, the president of the auction facility.

When Homolka arrived, Meints showed him the rifle and indicated that the elevation piece was missing. Homolka informed Meints that there was little that could be done. The advertising materials for the auction specifically indicated that all items were being sold on an "as-is basis," that there were no warranties or representations implied or intended, and that all sales were final. The sales posters further specifically indicated that the "[b]idder agree[d] that everything [was] sold as-is and they may not return any item." Nonetheless, Homolka offered to reimburse Meints and purchase the rifle back from him.

Meints did not accept the offer. Instead, "[h]e wanted to be reimbursed for his time, . . . his effort for being [at the auction] since 8 o'clock that morning looking at these items, and this was the item of the day that he picked out to stay for and he wanted to be reimbursed for all that." According to Kotas, Meints became "belligerent."

Meints became "[l]oud, raised [his] voice on more than one occasion about wanting to be reimbursed for his time and his efforts for the day."

Deputy Anthony Lytle, of the Saline County sheriff's office, was called to assist with the situation. Homolka explained to Lytle that Meints was upset over a gun purchase, and Lytle had a conversation with Meints. Meints told Lytle that the elevation piece was on the rifle prior to bidding at the auction, but was missing when he received the rifle after the purchase. Lytle testified that Meints "was very upset, advised [Lytle] that he had been there since early morning, [and] demanded that they find this piece or get this piece back for his gun." Homolka's offers to purchase the rifle back and refund Meints' money were not "good enough" for Meints.

There was evidence that the missing piece would likely "cost $4 to replace." Lytle testified that he told Meints that he could probably get "a $3 or $4 part to fix it."

Lytle testified that Meints "started raising his voice . . . and [g]ot pretty close to [Lytle] and was telling [Lytle] how, you know, this was ridiculous and that he wasn't going to pay for this part out of his own pocket." Meints asked, "Who's paying for my gas? It's $3-and-some a gallon. My time?" Meints "expected and demanded that they pay him for his time and his gas money while he was there all day." According to Lytle, when Meints was informed that it was "probably not going to happen, . . . Meints got upset, started clinching his teeth, his fists, and was all upset about it." Meints also demanded that Homolka "talk to the auctioneer to find the [previous] owner of the gun." Homolka agreed to try to locate the previous owner, and "things were calmed down somewhat then."

There is evidence that at some point during the incident, Meints left the scene. He returned, however, still possessing the rifle.

Lytle left the scene. He testified, however, that he only "drove about a half-mile away because [he] knew [he] was going to be back there." "Two minutes later [he] got called by dispatch [and was informed] they needed [him] back there because [Meints] was acting a little crazy." Lytle returned to the scene.

Lytle testified that he "could hear [Meints] as [he] was walking up the stairs" of the facility. Meints "was raising his voice and causing a stink with the guys, arguing, basically the same thing as [before Lytle had left]." Lytle testified that "[t]here were lots of people outside [and] you could look out the door and see several of those people staring in at the ordeal that was going on."

Lytle spoke to Meints and explained to him that he could either leave the scene "or he could be charged with disturbing the peace if he continued his behavior." Meints "continued on and on about how somebody had to pay him for his gas and his time and all this." According to Lytle, Meints's voice "was raised" and Meints "was very upset." "It was very obvious." According to Lytle, Meints told him that he "wasn't doing [his] job and justice needed to be done." Meints "just continued on and on and on and wouldn't quit, and pretty soon it got so bad that one of the guys went back and closed the door because there were so many people looking in at what was going on."

Lytle testified that he could not recall whether there was a trigger lock still on the rifle when Meints was handling it. Homolka testified that Meints had already paid for the rifle and that he returned to the building with it, so that it was likely that "the gun lock was off the gun when he was walking around with it."

Homolka testified that his peace was disturbed and that he was concerned about Meints' actions because "it's not good to have a guy yelling holding a rifle." Kotas testified that his peace was disturbed by the incident, that he was very upset, and that his "gut was tied in a knot" as a result of the incident. Kotas' brother also testified that his peace was disturbed, "and everybody else" in the area, because of the shouting. Kotas' brother also testified that the incident interrupted the business of vendors in the area who had difficulty communicating and doing business because of the disturbance.

On March 21, 2012, Meints was charged by complaint with disturbing the peace. Trial was held in the county court on August 21, and the county court found Meints guilty. The county court rejected Meints' assertion that conviction would be contrary to the First Amendment. Specifically, the court concluded that "it's not so much the words that [Meints] used in this case . . . it's the manner in which [he] utilized his words and his actions" and "the way [he] was acting, [his] refusal to act in a reasonable manner, [his] leaving after he was told to leave and returning, and the general loudness and actions that are testified to by the witnesses that do, in fact, constitute disturbing the peace." The county court imposed a $500 fine.

Meints appealed to the district court, and his assertions in the district court again included an assertion that conviction would be contrary to the First Amendment. The district court held that "it is clear that the words that [Meints] spoke were made in a loud and demanding voice, while he was holding a gun, from which the gun lock may or may not have been removed." The court further held that it agreed with the county court's conclusion "that it was the conduct of [Meints], including the thrusting of a gun at one of the witnesses, and not the content of his

words, that constituted the crime for which he was convicted. This was not constitutionally protected speech." The court affirmed the county court's order. This appeal followed.

### III. ASSIGNMENT OF ERROR

Meints' sole assignment of error on appeal is that his conduct constituted protected speech and that his conviction must, therefore, be vacated.

### IV. ANALYSIS

Meints' sole argument on appeal is that his conviction for disturbing the peace was contrary to the First Amendment. We find no merit to this assertion.

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I; *State v. Drahota*, 280 Neb. 627, 788 N.W.2d 796 (2010). The First Amendment limits the State's ability to prosecute certain criminal offenses. *State v. Drahota, supra*.

The First Amendment protects wide swaths of speech, but its protections are not absolute. *State v. Drahota, supra.* Historically, the Supreme Court has held that the First Amendment does not apply to certain categories of speech, including libel, obscenity, incitements to imminent lawlessness, true threats, and fighting words. *State v. Drahota, supra.*

"'Whether the First Amendment protects the activity which constitutes the violation of [a] statute must depend upon a judicial determination of the scope of the First Amendment applied to the circumstances of the case.'" *State v. McKee*, 253 Neb. 100, 106, 568 N.W.2d 559, 564 (1997), quoting *Dennis v. United States*, 341 U.S. 494, 71 S. Ct. 857, 95 L. Ed. 2d 1137 (1951). The question as to whether speech or conduct that led to a conviction is protected by the First Amendment is one of law to be determined by the appellate court. See *State v. McKee, supra*.

In *State v. McKee, supra*, the Nebraska Supreme Court reviewed a case in which an abortion protestor, Sharon McKee, was convicted of knowingly violating a protection order and urged on appeal that the conviction was contrary to the First Amendment. In that case, an obstetrician and gynecologist obtained a protection order against McKee which, in pertinent part, prohibited her from harassing him either by telephone or in person. During the period of the protection order, McKee and another individual went to the parking lot of the doctor's office building. McKee and the other individual followed the doctor into the building, and McKee stated to the doctor that "they dropped [the previous charge brought against me]. It's a waste of time calling the police. You don't need the police, you need to stop killing babies. That's what you need to do--killing beautiful, unborn children . . . ." *Id.* at 101, 568 N.W.2d at 561.

McKee was charged with knowingly violating a protection order. McKee filed a motion to dismiss, asserting that the protection order statute was contrary to the First Amendment as applied to her. The trial court denied the motion, and McKee was ultimately convicted.

On appeal, the Supreme Court determined that the words spoken by McKee did not fit into any of the exceptions to First Amendment protection. *State v. McKee, supra*. The court held that McKee was entitled to state her opinions about abortion within the confines of the First Amendment. The court held that any application of the protection order which would prohibit such speech would be unconstitutional. *State v. McKee, supra.*

The Supreme Court, however, did not conclude that conviction for violating the protection order necessarily violated the First Amendment. *State v. McKee, supra.* Instead, the court recognized that in addition to speaking to the doctor, McKee had also followed the doctor across the parking lot and into the office building housing his clinic. The Supreme Court concluded that this was sufficient evidence to submit to a fact finder to determine whether her conduct violated the protection order. *Id.* Thus, the court reversed and remanded for a new trial with directions to the trial court to instruct the jury to consider only McKee's conduct in determining whether she had violated the protection order. *Id.*

In *State v. Drahota*, 280 Neb. 627, 788 N.W.2d 796 (2010), the Supreme Court reversed and remanded a conviction for disturbing the peace on the basis of the First Amendment. In *State v. Drahota*, the disturbing the peace conviction was based on two e-mails sent by the defendant to a political science professor at the University of Nebraska. The issue on appeal was whether the defendant's speech fell within the category of "fighting words," which would make the speech unprotected. The Supreme Court concluded that the State cannot constitutionally criminalize speech solely because it inflicts emotional injury, annoys, offends, or angers another person. *Id.* The court concluded that the e-mails at issue were not "fighting words" and that the disturbing the peace conviction could not be constitutionally upheld when based solely on protected speech. *Id.* Compare *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989) (upholding disturbing peace conviction based on speech that constituted fighting words).

In the present case, Meints asserts that "[t]he applicable principles may be found in a variety of cases." Brief for appellant at 9. He then indicates that *State v. Mitchell*, 343 S.W.3d 381 (Tenn. 2011) "is one such case." Brief for appellant at 9. The defendant in that case challenged his conviction for disorderly conduct on the basis of First Amendment protections. The Tennessee Supreme Court, however, rejected the defendant's First Amendment assertion. *State v. Mitchell, supra.* The court in that case specifically concluded that the jury had found that the defendant's "aggressive conduct and his loud and rude behavior" violated the state's disorderly conduct statute and that "while words and also conduct expressive of an idea may qualify as protected 'speech,' the threatening behavior demonstrated" by the defendant was not protected by the First Amendment. *State v. Mitchell*, 343 S.W.3d at 394. In short, the conclusion of the Tennessee Supreme Court in the case cited by Meints as being indicative of the applicable principles to guide resolution of a case such as this one was precisely the opposite conclusion that Meints urges us to find in this case.

In his appellate brief, Meints presented approximately 8 pages of argument. After asserting that *State v. Mitchell, supra*, is indicative of the applicable principles for resolving this case, Meints presented us with an approximately 5½-page block quote, from the dissenting opinion of a single judge in that case. We are not persuaded that the dissenting opinion of a single appellate court judge in another jurisdiction should guide us to conclude that Meints' conviction was constitutionally impermissible.

Based on the precedent from Nebraska, discussed above, we conclude that Meints' conviction was not prohibited by the First Amendment. Unlike the conviction in *State v. Drahota, supra*, Meints was not convicted on the basis of speech. Rather, the record in the present case makes it clear that the county court based its conclusion on Meints' aggressive conduct and his loud and disruptive behavior. As the Nebraska Supreme Court specifically

recognized in *State v. McKee*, 253 Neb. 100, 568 N.W.2d 559 (1997), a conviction based on the conduct that accompanies what might otherwise be protected speech is permissible. In this case, the county court and the district court both specifically noted that the conviction was based on Meints' loud and aggressive behavior, accompanied by the facts that he was brandishing a rifle and that at one point, he thrust the rifle at one of the witnesses. There was evidence that his behavior disturbed the peace of several witnesses and that it also disrupted the business of others being conducted nearby. Meints was not convicted because of his speech or because of any protected expressive conduct.

We find no merit to Meints' assertion on appeal. We affirm.

AFFIRMED.