IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2013

STATE OF TENNESSEE v. MARCUS FRAZIER THOMPSON

Appeal from the Circuit Court for Madison County
No. 09-396        Roy B. Morgan, Jr., Judge

No. W2012-02012-CCA-R3-CD  - Filed October 21, 2013

The Defendant, Marcus Frazier Thompson, was convicted by a Madison County Circuit Court jury of five counts of aggravated robbery, Class B felonies. *See* T.C.A. § 39-13-402 (2010). He was sentenced as a career offender to ninety years to be served at sixty percent. On appeal he contends that (1) the evidence is insufficient to support the convictions, (2) the State improperly exercised a peremptory challenge on the basis of a prospective juror's race, (3) a witness's testimony should have been excluded due to a violation of the rule of sequestration, and (4) the trial court erred in admitting evidence of ammunition found during a search of the Defendant's apartment. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

C. Mark Donahoe, Jackson, Tennessee, for the appellant, Marcus Frazier Thompson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At the trial, Felecia Campbell testified that she went to the Upper Level Hair Salon in Jackson on February 24, 2009, to purchase makeup but waited in her car to talk to a co-worker on the phone. She said that she noticed commotion outside the business and that when she ended her conversation and was going inside, two black males ran from the salon. She said that although they were about four steps away, she did not see their faces. She said that one was taller than the other, that one had more hair than the other, and that they wore

dark clothes. She said they ran behind the building toward a subdivision area. She said that when she entered the business, nobody greeted her. She said that she asked if anyone was there and that after a few minutes, a woman who looked traumatized and was crying entered the lobby and said they had been robbed. She said she locked the door and called 9-1-1. She said that she did not see any other people in the salon but that there were broken cell phones on the floor. She said that she was the only person who used her phone and that it was the only working phone at the time. She said she was at the salon when the police arrived.

On cross-examination, Ms. Campbell testified that she did not remember seeing either of the men leaving the salon wearing a "do rag," gloves, glasses, or a "hoodie." She said that she did not pay attention to the type of clothing they wore but that she remembered dark clothes. She did not remember the short-haired person having facial hair or wearing brown shoes. She said the two ran into a subdivision slightly further than twenty steps from the door. She stated that they were on a road when she stopped watching and that she did not notice a tattoo on either person's neck or whether they were carrying anything. She did not notice any weapons.

Tonya Jones testified that she worked at the Upper Level Hair Salon on February 24, 2009, and that at around 4:00 p.m., she was weaving and highlighting Joanne Duke's hair when two black men entered the salon. She identified the Defendant as one of the men who entered the salon. She said the Defendant instructed her to walk slowly and not touch anything. She said he was dressed in dark clothes, including a hoodie, a do rag, and gloves. She said that he had a gun in his right hand at waist level, which was not pointed at anyone. She said the Defendant walked her and Ms. Duke down the hall to a well-lit, 10' by 12' makeup room on the right. She said Tonya Carey, two clients and another black male were in the room. She said that the Defendant asked if she was the owner and that she told him the owner, Sarah Hardwick, was not there. She said the Defendant pointed to the cash register with his gun and said she knew why he came. She said the Defendant was about five feet away. She said she removed the bills from the cash register and gave him the money.

Ms. Jones testified that the Defendant asked for all of their personal money and that the other robber walked them individually to and from the other room. She said the second man had a gun and was taller and heavier than the Defendant. His hair was covered, and he was dressed in similar clothes to the Defendant's. She said the other male saw her cell phone, asked for it, and placed it in his pocket. She said she removed about $30 and gave it to him. She said the Defendant and the other man took their cell phones and made them check their pockets. She stated that the Defendant requested everyone's jewelry and that she gave her wedding ring to him. She thought about what her family would do without her and was concerned about being killed. She said that the Defendant asked if there was any more money or a safe and that she said no. She said that the Defendant looked under the tray in

the cash register and that the men disabled the land line, the portable phones, and the cell phones. She said the Defendant shut the door to the room and told them to stay for sixty seconds. She said that she heard the outside door open and close and that she waited sixty seconds to leave the room. She said that she heard Felicia Campbell in the main room asking if anyone was there and that they called the police. She said that the Defendant had the gun while taking the items and that she was concerned about being shot or killed.

Ms. Jones testified that Investigator Austin presented her with photograph line ups, from which she identified the Defendant and the other man. She was unsure but thought the robbery lasted about five minutes. She was certain the Defendant was the person who robbed her. She said Investigator Austin returned the wedding ring to her.

On cross-examination, Ms. Jones testified that the shorter person held a gun and that he did not move it between his hands. She said she saw the bigger and taller person in the makeup room and outside the store before the men came inside. She stated that the taller man held a gun but that she was not focused on him because she was talking to the Defendant. She did not know what kind of gun he had or in which hand he held it. She said that the smaller person had his hair covered by a dark do rag and that the larger person was wearing a hoodie. She said that the larger person took her cell phone and put it into his pocket and that she never saw it again. She said that a short time passed between the door to the makeup room closing and the outside door opening and closing.

Ms. Jones testified that the person she saw in the salon did not have any gray facial hair or wear glasses. She said that otherwise, he was the same in the photograph and the salon. She said she talked to an investigator that day and did not mention a white do rag because she did not see one. She said the short robber wore a dark do rag. She said she did not mention a neck tattoo, a tear drop tattoo under the eye, or dark green gloves to the police. She stated that although she mentioned the men wore dark clothes, she did not remember every detail because she had a gun in her face.

Tonya Carey testified that on February 24, 2009, she was selling makeup to customers at the Upper Level Salon when a man in a hoodie approached her with a gun, instructed her to sit, and told her that they were being robbed. She said another man entered with a gun pointed at her co-worker, Tonya Jones, and another customer. She identified the Defendant as the gunman. She said that she sat down as instructed and that the makeup room was small and well-lit. She said that the Defendant asked her the location of the owner and the safe and that Tonya Jones told him the owner was not there and the salon did not have a safe. She said the Defendant pointed his gun at the register, instructed them to open it, and asked whose phone was on the counter. She said that she told him it was hers and that the Defendant smashed it on the floor.

Ms. Carey testified that the Defendant told Ms. Jones to remove the money from the cash register and that he told them to empty their purses and give him their jewelry. She said that she stood a foot away from the Defendant when she handed him about $60 from her pockets. She did not remember if the Defendant took money from anyone else. She said the Defendant took Ms. Jones's wedding ring. She said that he held a gun and that she feared for her life. She thought the robbery lasted twenty minutes but said it could not have lasted that long. She said that he told them to wait in the room for sixty seconds and that as she waited, she heard a female voice ask if anyone was there. She said that Tonya Jones cracked the door and told the woman about the robbery and that the woman said she saw the two robbers and called the police. She said that she identified the Defendant and the other man who approached her with a gun from photograph lineups Officer Austin showed her.

On cross-examination, Ms. Carey testified that there were no differences between the person in the photograph lineup and the person she saw during the robbery. She did not remember if there were two customers in the makeup room when the robbery began. She said that she did not hear the outside door open and close after the robbers left. She said the first person who entered the salon wore a gray hoodie, blue jeans, and dark shoes and had a gun. She said she did not mention the blue jeans or dark shoes to the police. She stated that the second person was shorter and had a gun but that she did not mention to the police his having tattoos, bright green gloves, glasses, or gray facial hair. She identified a copy of the statement she gave the police and said it identified the robber as in his early thirties. She said she remembered the larger man's throwing her cell phone on the ground and taking a cell phone from Ms. Jones. She said she remembered the larger man's asking for cell phones and the smaller man's putting them into his pockets. She said that the smaller man did not wear a hoodie and that his hair was visible through the item on his head but that she did not remember if he wore a do rag.

On redirect examination, Ms. Carey testified that she was focused on the guns during the robbery. She said that the larger man took the cell phones and that the Defendant smashed her phone. She stated that the Defendant was skinnier than he was in court and that his behavior was aggressive and violent. She said in the police statement that the Defendant had a goatee and large yellow teeth. She said he was wearing a black do rag. She said that when giving the police statement, she said he might have worn brown shoes but that she did not remember much about his clothes.

On recross-examination, Ms. Carey testified that she did not use the word "violent" in her police statement. She said that although the Defendant had gained weight since the events, she knew he was the person who robbed her. She agreed that she told the police the Defendant was wearing a black do rag but that in court she could not remember and said he

might have been wearing a nylon. She said that she was focused on the black handgun and that she did not remember any chrome on the gun and thought it probably had a short barrel.

Heather Hicks testified that on February 24, 2009, she was in the salon's makeup room with Tonya Carey and another woman when two men entered the salon. She said one was a black male in his late twenties to early thirties, six feet tall, had broad shoulders, wore a hoodie, and carried a gun. She said that he told them to sit down because it was a robbery and that the Defendant entered from the first room with Tonya Jones and another woman. She said he had a weapon and demanded the money from the cash register and their purses, as well as all their cell phones. She said the makeup room was small and well lit.

Ms. Hicks testified that the Defendant let her keep her purse but wanted the money inside. She gave him about $80. She said she handed him the money from about three feet away. She said that he told Tonya Carey to get the money from the cash register and that she complied. She said the Defendant looked to see if there was money in the cash register and asked for their jewelry. She said the Defendant took Tonya Jones's wedding ring after she told him what it was. She said that a lot happened around her and that she was scared for her life. She said that the men took everyone's cell phones and that the Defendant threw her cell phone onto the floor and broke it. She said that when the men learned there was no safe in the salon, they told the women to wait in the room and left. She said she and the other victims waited in the room until a woman entered the main room and asked if the salon was open. She said they allowed the woman to enter and used the woman's cell phone to call the police. She said that she was in the room with the men for about five to ten minutes and that her interactions with the Defendant included her request to keep her purse and hearing him speak to the others. She said that she studied his face in order to identify him later. She said that she met with Investigator Austin and that he gave her a photograph lineup from which she identified the Defendant. She said she was positive the Defendant was the person who robbed her.

On cross-examination, Ms. Hicks testified that Investigator Austin gave her two photograph lineups and that she was unable to identify the taller and broad-shouldered man. She said that person was wearing a black hoodie and that she did not recall if he wore a do rag. She stated that he held an automatic weapon and that the shorter man held a shorter revolver. She said that she was close to the shorter man and that she focused on his face. She said she gave a description of him to the police that did not mention a white do rag and did not remember if he wore one. She said she did not tell the police that he had a tear drop tattoo under his right eye, that he was wearing bright green gloves, that he had any white hair in his goatee, or that he was wearing glasses. She said that she paid attention to a neck tattoo. She said that her memory would have been better immediately after the events rather than two and one-half years later and that she did not recall telling the police that the man was

-5-

wearing a do rag. She said that she did not write out the police report but that she reviewed it and initialed it.

Joanna Duke testified that on February 24, 2009, she was having her hair highlighted at the salon by Tonya Jones when the Defendant and another black male, later identified as John Freeland, entered wearing hoodies and do rags. She said she failed to identify the Defendant in a photograph lineup because she only saw his side during the robbery and her adrenaline was rushing. She said that he wore glasses during the robbery but not in the photograph lineup. She said he told them that it was a robbery and to go into the next room. She said that she saw the Defendant with a weapon and that they moved to a small, well-lit room. She said that when they were in the room, the Defendant said he wanted their money, jewelry, and phones and the money in the cash register. She said that she only had $4 but that Freeland escorted her to her purse for her money and phone. She said she identified Freeland in a photograph lineup.

Ms. Duke testified that she did not have any jewelry and that the Defendant insisted that Ms. Jones give him her wedding ring. She said several people had cell phones, which the Defendant smashed on the floor. She did not remember a conversation concerning a safe. She saw the Defendant hold a pistol and was afraid she would be killed. She said that the Defendant told them to wait in the room for sixty seconds, that the men closed the door and left, and that she and the others did not leave the room until another woman entered the store. She said they used the woman's cell phone to call the police.

On cross-examination, Ms. Duke testified that the men allowed Ms. Jones to finish a small task with Ms. Duke's hair before she was moved. She said that one of the women in the salon did not testify and that they were separated once the police arrived. She said that she saw the shorter man from his side and that he wore a white do rag, a black hoodie, circular gold rimmed glasses, and black gloves with green mesh on the thumb. She said that she was on his right side and that she did not mention his having any tattoos or gray facial hair to the police. She said that the person who took her phone was not in court and that he was taller, heavier, and wore a black do rag, gloves, and a hoodie. She said that she identified him in the photograph lineup because he seemed nicer than the Defendant. She thought that she might have seen him at her job. She said that she was alone with Freeland when she went to the front room to get her phone and that she did not know what happened to it. She said that she had not identified the phone before she identified it in court, other than looking at pictures of it. She said that once the men left and closed the door, she did not remember hearing the front door open and close. She said that the smaller man had a gun but did not know in which hand he held it. On redirect examination, Ms. Duke testified that the smaller man was the Defendant.

Sarah Hardwick, the owner of the Upper Level Hair Salon, testified that on February 24, 2009, she was called to the salon, where she saw several police officers. She said that $600 was missing from the cash register. She said that the business was equipped with a land line, that the phones were broken, and that the lines were pulled out of the wall.

Christina Gooch testified that she was buying makeup at the salon on February 24, 2009, when a man told her to sit down because it was an armed robbery. She said she complied because he held a gun. She said that he was a thin black male and that she looked at the floor most of the time because she did not want to give him a reason to harm her. She said that another man was with him during the robbery, that they took $2 from her, and that she could not positively identify anyone.

On cross-examination, Ms. Gooch testified that she left before the police could talk to her. She said she did not know Joanna Duke personally. She said Detective Newbill asked her to make a statement after the police identified her from a receipt. She did not know if either man wore brown shoes. She said she heard and saw everything but did not look directly at the men. She said the smaller man put her cell phone into his pocket.

Jackson Police Investigator Sam Gilley testified that he was assigned to the Street Crimes Unit of the Jackson Police Department in 2009 and that he made a traffic stop of John T. Freeland and the Defendant, who was the passenger. He identified the Defendant in the courtroom. He said that Mr. Freeland was charged with driving on a revoked license and that he thought they matched the descriptions of the suspects in the salon robbery. On cross-examination, Investigator Gilley testified that he was unaware that Mr. Freeland had a younger brother whose description matched the Defendant's.

Jackson Police Investigator Jeff Austin testified that Investigator Gilley provided him information that Freeland and the Defendant fit the descriptions of the robbery suspects. He said he prepared photograph lineups and showed them to the victims separately. He said that Tonya Jones and Tonya Carey viewed the lineups and that they identified both suspects. He said Joanna Duke was unable to identify the Defendant. He said Heather Hicks identified the Defendant. He said that the photographs were in black and white because he could not find five other people with tattoos on their neck. He said black and white photographs did not show the markings on the Defendant's neck.

Investigator Austin testified that the police identified Joanna Duke from information in her cell phone. He said he recovered Ms. Jones's ring from Affordable Jewelry and Pawn, and he identified a photograph of the ring that Ms. Jones gave him. He said that he spoke with Pheap Duch at the pawn shop and that she gave him a copy of the pawn ticket for the ring. He identified the pawn ticket, which he said listed the seller as Lashundra Mosley,

provided details about the ring, and was dated March 2, 2009. He said Investigator Gilley told him Ms. Mosley was the Defendant's girlfriend. He said the pawn sheet from the pawn shop's book contained the same information as the pawn ticket.

On cross-examination, Officer Austin testified that before he assembled the photograph lineups, he gathered information from the witnesses but did not contact the Defendant. He said he obtained a color photograph of the Defendant in which the Defendant did not wear glasses. He agreed that some of the witnesses said the smaller man wore glasses but that he did not look at the police report to see if the smaller man wore glasses. He said that criminals sometimes wore unnecessary accessories during a crime. He said the fact that the Defendant required glasses was not discovered during the investigation. He said that if the Defendant always wore glasses, it would be fair to include a photograph of him wearing glasses. He said that the pawn ticket did not have the Defendant's name and that he did not give a photograph lineup to Ms. Duch because she knew who pawned the ring. He said that the person who pawned the ring provided identification and that Ms. Duch said the seller entered the store alone.

Pheap Duch, the owner of Affordable Jewelry and Pawn, testified that Investigator Austin asked her about a gold ring and that she gave him the paperwork for the ring. She identified a picture of the ring and said the police took the pawn ticket and the ring. She said Ms. Mosley provided her driver's license when she pawned the ring. She identified the pawn sheet and said the same information was on it and the pawn ticket. On cross-examination, she stated that Ms. Mosely was alone when she pawned the ring and that the ring was the only item pawned that day. She said she did not see Ms. Mosley's car.

Jackson Police Sergeant Phillip Kemper testified that on March 10, 2009, he went to the location where Mr. Freeland and the Defendant were stopped. He said he also searched and collected evidence from an apartment on March 10, 2009. The apartment had one bedroom, a kitchen, a living room, and a bathroom. He said they collected the Defendant's birth certificate, a utility receipt, a handwritten bill of sale, Social Security papers, and Tennessee Department of Human Services papers on the dresser in the bedroom. He identified a blue wallet found in the apartment, which contained the Defendant's insurance card, TennCare card, and other State of Tennessee paperwork. He identified an EBT card with the Defendant's name, which was found in a jacket on the bed. He identified six twenty-two caliber cartridges from the bedroom windowsill, two twenty-two caliber cartridges from a shoe in the closet, and a twenty-two caliber cartridge from the floor beside the bed. He recovered a maroon blackberry cell phone in a pocket of a tan trench coat in the bedroom closet.

On cross-examination, Sergeant Kemper testified that Investigator Newbill photographed the evidence they collected. He said that they did not collect the trench coat in which the phone was found, but the coat and the phone were photographed together. He said that the birth certificate and a utilities receipt had an address other than the apartment and that the utilities receipt was addressed to Edgar Thompson. He said the documents from the Department of Human Services and TennCare were also addressed to the Defendant at the other address. He said that they did not collect the shoe in which two of the bullets were found and that no firearm was found. He said that no diagram identified where each item was found in the room but that he noted where they were found while he tagged them. He said they recovered twenty-two pieces of evidence and did not know if any were sent for forensic tests. Five cell phones were recovered.

On redirect examination, Sergeant Kemper testified that all the evidence led them to search the apartment and not the other address on the documents from the apartment. On recross examination, Sergeant Kemper stated that the apartment leased to Tashundra Mosley. He said that there was no attempt to search the address identified in the documents and that he did not believe there was probable cause for a search. On redirect examination, Sergeant Kemper stated that the evidence at the apartment did not lead them to search the other address.

Tashundra Mosley testified that she was in jail and that her plea agreement provided for concurrent sentences if she testified truthfully in the Defendant's case. She said that she was not truthful initially when she gave a statement to Investigator Austin about how she obtained the ring. She said she was afraid of what the Defendant, her former boyfriend, might do. She said that in February and March 2009, she and the Defendant lived in a one-bedroom apartment and had discussed marriage. She said that she, the Defendant, and their two sons had lived in the apartment since October 2008. She said that the Defendant kept a wallet and personal documents in the apartment. She did not know anything about the ammunition in the apartment. She said that she had seen the cell phone that Ms. Duke identified previously as hers because Ms. Mosley found it inside the couch. She did not know to whom it belonged, and she put it back when it would not turn on. She said that at the Defendant's request, she pawned an engagement ring at Affordable Jewelry and Pawn on March 2, 2009. She said the Defendant instructed her to pawn it because he and Freeland did not have identification. She identified her signature on the pawn ticket.

On cross-examination, Ms. Mosley testified that the Defendant wore glasses all the time. She stated that he had asthma, was unable to run, and received disability benefits. She said that although she did not know whether the Defendant's name was on the lease, he helped her get the apartment. She identified the lease agreement and acknowledged that her signature was the only one on it. She said she made an honest mistake about the names on

the lease. She did not know about the Defendant's paying for utilities at another residence. She knew about a house where his father lived but said it was not in the Defendant's name. She said that she stayed at the other house one night and that she did not know much about who stayed there because she worked. She said that Freeland came to the apartment often because he and the Defendant were friends. She said her two-year-old son lived there. She said the Defendant took medication and sometimes had facial hair. She said that the hair on his head was gray but that he shaved it. She had never seen him with black hair.

Ms. Mosley testified that she was charged with five counts of aggravated robbery but that she did not know the possible sentence was seventy-two years. She said that as a result of her plea agreement, she would receive four years at thirty percent and would not have a robbery conviction. She said she was also charged with first degree murder, but under her plea agreement, she would not receive a life sentence. She said that she had not been sentenced and that if she did not testify truthfully her sentence could be increased. She identified the rights waiver form she signed. She said that she did not think she needed a lawyer, that she agreed to tell the officer the truth, and that she did not tell the truth because she was scared. When she gave the statement, she did not think she had done anything wrong. She said she knew she did not have to talk to the police but had left her child with someone and wanted to return to her child. She said that she could have left the police interview had she wanted but that the police had taken her shoes. She said that they did not tell her she would not go to jail if she made a statement and that she cooperated with the police. She said that although portions of her statement were true, she knew she did not tell the truth. She said she changed her story while talking to the police. She said she told them the Defendant gave her the ring, but they did not write it down. She said that the second time she talked to the police, she told them she found the ring outside, which was not true. She said that after she gave her statement to the police, she read and signed it. She did not tell the police that she was scared of the Defendant.

On redirect examination, Ms. Mosley testified that she, the Defendant, and Freeland went to the pawn shop. She said the Defendant and Freeland were always together. She said that she was not at the salon during the robbery and that she heard about it on the news. She said that she pleaded guilty to theft but not robbery.

The jury convicted the Defendant of five counts of aggravated robbery. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions. The State counters that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2010). "Aggravated robbery is robbery . . . [a]ccomplished with a deadly weapon." T.C.A. § 39-13-402.

In the light most favorable to the State, the evidence shows that three witnesses identified the Defendant as one of the men who robbed them and said the Defendant had a gun. Ammunition and Ms. Duke's phone were recovered from the apartment where the Defendant lived with Ms. Mosley. The Defendant's personal documents and identification were found at the apartment. Ms. Mosley testified that the Defendant gave her Ms. Jones's ring and asked her to pawn it. From this evidence, a rational trier of fact could determine that the Defendant was guilty beyond a reasonable doubt of five counts of aggravated robbery. The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking an African-American prospective juror from the panel. He argues that the State's proffered explanation of its reason for striking the prospective juror was not sufficient to overcome the *Batson* challenge. The State contends that the Defendant has waived our consideration of the issue by failing to state the applicable standard of review. The State contends, as well, that the Defendant has not established that the trial court's permitting the State's exercise of the peremptory challenge was clearly erroneous. We conclude that the Defendant is not entitled to relief.

Regarding the State's waiver argument, Tennessee Rule of Appellate Procedure 27(a)(7)(B) provides that an appellant's brief shall state the applicable standard of review. Although the State is correct that the Defendant did not state the standard of review, the Defendant's brief otherwise states the applicable law. We caution counsel that an attorney who fails to comply with the Rules of Appellate Procedure and the rules of this court does so at his client's peril.

*Batson* held that the Equal Protection Clause prohibited the prosecution's exclusion of potential jurors based solely upon their race. *Id.* at 89; *cf. Georgia v. McCollum*, 504 U.S. 42, 59 (1992) (extending rule to peremptory challenges made by a defendant). In order to determine whether a peremptory challenge has been exercised based upon a prospective juror's race, the defendant must first establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96. Second, the prosecution must be allowed an opportunity to rebut the prima facie case by offering a race-neutral reason for the challenge. *Id.* at 97. If the prosecution does so, the court must then determine, based upon the facts and circumstances, whether the defendant has established purposeful discrimination. *Id.* at 98.

A prosecutor's race-neutral explanation must be reasonably clear and specific. *Id.* However, it need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767-78 (1995). "Unless discriminatory intent is inherent in the prosecutor's explanation, it will be deemed race neutral." *Id.* at 768. However, the trial court has the obligation to examine the proffered race-neutral explanation and assess its plausibility in light of all the evidence and to determine that the explanation is not pretextual. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).

The record reflects that during jury selection, the State exercised a peremptory challenge to a prospective juror because the prosecutor thought she was related to a defendant in another case who had a prior criminal history. The prospective juror had the same surname as the person with the pending case and criminal history. The prospective juror was later questioned individually and stated that she knew the person to whom the prosecutor referred. She said that they were "not directly" related but that some of his siblings were related to her. The court excused the juror based upon the State's explanation of its exercise of the peremptory challenge.

In addressing the challenge, the prosecutor provided a race-neutral basis for the State's exercise of a peremptory challenge against the prospective juror. The record fails to reflect inherent discriminatory intent in the peremptory challenge. The trial court did not err in allowing the State to exercise its peremptory challenge. The Defendant is not entitled to relief on this basis.

### III

The Defendant contends that the trial court erred in ruling that Sergeant Kemper could testify notwithstanding a violation of Tennessee Rule of Evidence 615 regarding sequestration of witnesses. The State contends that the Defendant has waived this court's consideration of the issue because he failed to cite the standard of review in his brief and, in

any event, that the trial court did not abuse its discretion in allowing the testimony. The State is correct that the Defendant has not provided the applicable standard of review. The Defendant's brief otherwise provides the applicable law. We will consider the issue.

Tennessee Rule of Evidence 615 provides

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before *voir dire*, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.

The purpose of Rule 615 "is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992) (*citing Smith v. State*, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977)). In order for this court to grant relief based upon a Rule 615 violation, a Defendant must show prejudice and abuse of discretion. *See State v. Coulter*, 67 S.W.3d 3, 52 (Tenn. Crim. App. 2001); *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). The rule does not include a list of sanctions for a violation, and the court has discretion in determining remedial measures. "If a witness inadvertently and unintentionally hears some trial testimony, the sense of the rule would permit the judge to allow the witness to testify if fair under the circumstances." Tenn. R. Evid. 615, Advisory Comm'n Cmts.

The record reflects that Rule 615 was in effect during voir dire and that defense counsel noticed Sergeant Kemper in the back of the room. When questioned, Sergeant Kemper said that he had been there five minutes and that he had reviewed his notes and not paid attention. The Defendant argued to exclude him as a witness, but the court allowed him to testify. We note that Sergeant Kemper was present briefly during voir dire, not witness testimony. The Defendant has not demonstrated any prejudice from the violation of Rule 615. The trial court did not abuse its discretion in allowing Sergeant Kemper to testify, and the Defendant is not entitled to relief on this basis.

**IV**

The Defendant contends that the trial court erred in admitting six twenty-two caliber cartridges found in the bedroom of the apartment. The State contends that the Defendant has waived consideration of the issue by failing to cite the applicable standard of review and, in any event, that the evidence was properly admitted. Again, the State is correct that the Defendant has not provided the applicable standard of review. The Defendant's brief

otherwise provides the applicable law. We will consider the issue.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Our supreme court has defined unfair prejudice as "['a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Mitchell*, 343 S.W.3d 381, 389 (Tenn. 2011) (quoting *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)). "Rule 403 decisions fall within the discretionary authority of the trial court and will not be overturned absent an abuse of discretion." *Id.*

Although no weapon was recovered, several victims testified that the Defendant had a gun during the robbery. The ammunition was found in the bedroom along with the Defendant's personal property, and the Defendant's then-girlfriend denied any knowledge of the ammunition. Ms. Duke's cell phone was found in a coat pocket inside the closet where some of the ammunition was found. The Defendant's possession of ammunition in his apartment was relevant and probative to show that a circumstantial connection existed between the Defendant and the robbery and that the Defendant was one of the perpetrators and possessed a gun during the crime. We conclude that admission of the evidence did not unfairly prejudice the Defendant's case. Mere possession of ammunition in one's home, without more, does not suggest that a person has a criminal disposition. We acknowledge that the Defendant had prior felony convictions that would have prohibited him from possessing a gun or ammunition. However, the jury was not informed of the Defendant's prior criminal record. The trial court did not abuse its discretion in admitting the evidence. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE